IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Criminal No. 14-40 |
| | ) |
| MICHAEL TYRONE WALLER, | ) Judge Nora Barry Fischer |
| | ) |
| Defendant. | ) |

MEMORANDUM OPINION

Presently before the Court are a Motion to Suppress, (Docket No. 18), filed by Defendant Michael Tyrone Waller ("Waller") on March 27, 2014, the Government's opposition thereto, (Docket No. 20), and Defendant's Reply (Docket No. 25). On April 25, 2014, this Court held an evidentiary hearing on Waller's motion. (Docket Nos. 26, 27). Upon his request, the hearing was continued until May 30, 2014, during which the parties provided testimony, documentary exhibits, and oral argument. (Docket Nos. 32, 33). The official transcript of the proceedings has been reviewed and considered by the Court. (Docket No. 41). The Government submitted its proposed findings of fact and conclusions of law on July 9, 2014, and Defendant submitted his on July 29, 2014. (Docket Nos. 44, 52). Upon consideration of all of the parties' submissions, the evidence of record, their arguments, and for the following reasons, Defendant's Motion to Suppress (Docket No. 18) is denied.

I.  FINDINGS OF FACT

The credible evidence offered at the May 30, 2014 suppression hearing established the following facts.[1] To the extent that Waller's testimony contradicted theirs, the Court found the officers' testimony to be more credible.[2]

On February 3, 2013, a few minutes before two o'clock in the morning, Officer Aaron Obsenica ("Officer Obsenica") of the Pittsburgh Bureau of Police, Zone 5, received the first call indicating that a shooting occurred at Phase Bar, located at 7232 Hamilton Avenue. (Tr. at 53:12-14,56:7-10, 57:4-8) (Officer Obsenica Tesitfying). At approximately 1:57 a.m., he responded to the dispatch, which relayed that a female had been shot. (Tr. at 55:8-10) (Officer Obsenica Testifying). Upon his arrival at Phase Bar, Officer Obsenica went to the parking lot directly across from Baker's Dairy.[3] (Tr. at 59:5-9) (Officer Obsenica Testifying). He found victim Tamika McAfee lying on the ground, in significant physical and mental distress from a gunshot wound to her right leg. (Tr. at 59:10-16).

With other officers on the scene as well, and in the presence of Officer Dustin Rummel ("Officer Rummel"), Officer Obsenica spoke with a male witness with the initials R.N.[4] who provided his first and last name, his address, his date of birth, and telephone number. (Tr. at

---

[1] All citations to "Tr." refer to the transcript of the May 30, 2014 hearing, filed at Docket No. 41.
[2] Officer Dustin Rummel graduated high school in 2005 and obtained a bachelor's degree in criminology from Indiana University of Pennsylvania. (Tr. 78:25-79:1) (Officer Rummel Testifying). He then graduated from the police academy. (Tr. at 79:4-5) (Officer Rummel Testifying). Officer Jonathan Craig has been a police officer since October 2007, and he has been employed full-time by the City of Pittsburgh for his entire career. (Tr. at 80:19-81:1) (Officer Craig Testifying). He graduated from high school in 2001 and obtained an associate's degree from the Community College of Allegheny County. (Tr. at 81:3-4) (Officer Craig Testifying). He served in the Marine Corps for six years and then attended the police academy. (Tr. at 81:7-13) (Officer Craig Testifying). Officer Aaron Obsenica graduated from Hopewell High School in 1999 and then obtained a bachelor's degree in elementary education from Duquesne University. (Tr. at 110:1-5) (Officer Obsenica Testifying). He passed the test to become a police officer and underwent the educational and training process for same. (Tr. at 110:15-23) (Officer Obsenica Testifying).
[3] Baker's Dairy is located at 7302 Hamilton Avenue. (Tr. at 62:13-15) (Officer Obsenica Testifying).
[4] Because this individual is a witness to an on-going homicide investigation, his full name is not disclosed.

60:18-61:23) (Officer Obsenica Testifying); (Tr. at 74:18-19) (Officer Rummel Testifying). R.N. also told Officers Obsenica and Rummel the following:

1. He was at the bar until 1:50a.m., at which time he walked to his vehicle in the parking lot. (Tr. at 62:10-13) (Officer Obsenica Testifying);

2. He heard about five gunshots, and observed a red Chevrolet Malibu and a black-colored vehicle parked in front of Baker's Dairy. (Tr. at 62:13-15) (Officer Obsenica Testifying);

3. He heard the shots and turned to look in the direction where he believed they came from, which was toward Baker's Dairy, where he saw the two vehicles. (Tr. at 71:5-14) (Officer Obsenica Testifying); and

4. He observed two black males in that area, and the two vehicles fled at a high rate of speed down Hamilton Avenue, with one turning left and one turning right.[5] (Tr. at 62:15-18) (Officer Obsenica Testifying).

Officer Rummel issued a dispatch informing the other officers that there was a red Malibu traveling in the area possibly involved in the shooting at Phase Bar.[6] (Tr. at 65:20-24) (Officer Obsenica Testifying); (Tr. at 74:24-75:1) (Officer Rummel Testifying).

Officer Jonathon Craig ("Officer Craig") responded to the dispatch, and he and his partner, in a marked car, were checking the area for both of the vehicles described as possibly being involved in the shooting: the red Chevrolet Malibu and a dark colored sedan. (Tr. at 82:1-2, 82:16-23, 84:10-12) (Officer Craig Testifying). Typically, the streets around Phase Bar at two o'clock in the morning are quiet. (Tr. at 108:21-109:2) (Officer Craig Testifying). Due to the cold weather, there was not a lot of pedestrian or vehicle traffic on the night of February 3, 2014.

---

[5] R.N. was unsure as to which vehicle turned onto which street. (Tr. at 62:18-19) (Officer Obsenica Testifying).
[6] Officer Rummel erred in making the dispatch when he said "Frankstown" instead of "Hamilton" when referring to the two fleeing vehicles. (Tr. at 75:11-19) (Officer Rummel Testifying). Frankstown Avenue and Hamilton Avenue are two blocks apart and run parallel through Homewood. (Tr. at 75:20-24) (Officer Rummel Testifying).

(Tr. at 109:3-5) (Officer Craig Testifying). While in the vicinity of the shooting, Officer Craig and his partner initially saw the red Malibu at the intersection of North Homewood Avenue and Hamilton Avenue. (Tr. at 85:22-23, 88:24-25) (Officer Craig Testifying). The officers followed the vehicle, but did not observe any traffic violations. (Tr. at 89:3-13) (Officer Craig Testifying).

After determining that the vehicle was a red Malibu, Officer Craig and his partner activated the overhead lights and pulled over the vehicle. (Tr. at 89:14-19) (Officer Craig Testifying). Officer Craig relayed via a dispatch that he pulled over a red Chevrolet Malibu with two occupants inside and provided the license plate number. (Tr. at 89:23-90:10) (Officer Craig Testifying). The vehicle was stopped at approximately 2:09 a.m., very shortly after the shooting, which had occurred at approximately 1:57 a.m. (Tr. at 108:4-9) (Officer Craig Testifying). Over objection from the Government, Officer Craig testified that there was sufficient time for the red Malibu to leave the scene and return to the scene in that time frame.[7] (Tr. at 108:10-17) (Officer Craig Testifying). In Officer Craig's experience, criminal actors often return to the scene of a shooting to ensure that a victim is dead. (Tr. at 107:10-17) (Officer Craig Testifying).

Officer Craig and his partner informed the occupants that they were stopped because there was a recent shooting a few blocks away, and one of the witnesses said that a red Chevrolet Malibu was involved. (Tr. at 90:21-91:1) (Officer Craig Testifying). The driver of the vehicle, Tyrone Benjamin, was cooperative. (Tr. at 90:16-17, 91:2-5) (Officer Craig Testifying). Waller, however, was uncooperative. (Tr. at 91:14-15) (Officer Craig Testifying); (Tr. at 29:18-21) (Waller Testifying). He said that he would not get out of the vehicle, that the only reason the police pulled them over was because they were black, and that he wanted to speak to a

---

[7] In its Response (Docket No. 20 at 10-11), the Government provides statistics indicating the number of red Chevrolet Malibus produced each year in order to bolster his position on the present motion. The Court has reviewed and considered same, but believes that such statistics are not material to this matter.

4

supervisor. (Tr. at 91:17-22) (Officer Craig Testifying). Waller provided inaccurate identification to the officers vis-à-vis a false name, "Maurice Murray," and a false date of birth. (Tr. at 92:10-18) (Officer Craig Testifying); (Tr. at 30:4) (Waller Testifying). While waiting for a supervisor, Waller refused to obey Officer Craig's order to keep his hands on the dashboard by repeatedly reaching down to touch the left side of his body. (Tr. at 9:1-9) (Officer Craig Testifying).

Waller's failure to follow the officers' instructions continued, and he was removed forcibly out of the vehicle by the officers. (Tr. at 92:19-93:13) (Officer Craig Testifying). While out of the vehicle and despite Officer Craig's instructions to do so, Waller did not keep his hands away from his body, nor did he keep his hands on the vehicle. (Tr. at 93:18-22) (Officer Craig Testifying). Officer Craig forced Waller's right hand onto the vehicle while his left hand remained clenched close to his body. (Tr. at 93:24-25) (Officer Craig Testifying). At the same time, another officer saw Waller's hand on the left side of his body and screamed "gun." (Tr. at 94:2-4) (Officer Craig Testifying). Then, the officers engaged in a struggle with Waller, during which a gun fell from Waller's person and another officer picked it up. (Tr. at 94:6-13) (Officer Craig Testifying). With Waller still not in compliance, the officers maced him, to no avail, and then tasered him. (Tr. at 94:19-95:3) (Officer Craig Testifying). After he was tasered, the officers were able to arrest him. (Tr. at 95:4-5) (Officer Craig Testifying).

II. <u>PROCEDURAL HISTORY</u>

On February 28, 2014, the Government filed an Indictment charging Waller with one count of Possession of a Firearm by a Convicted Felon, on or about February 4, 2013, in violation of 18 U.S.C. § 922(g)(1). (Docket No. 1). On March 27, 2014, Waller filed the instant Motion to Suppress Evidence. (Docket No. 18). On April 4, 2014, the Government filed its

5

Response to Waller's Motion to Suppress, (Docket No. 20), and on April 21, 2014, Waller filed his Reply. (Docket No. 25).

This Court convened a hearing on the Motion to Suppress on April 24, 2014, during which Defendant, *pro se*, moved to continue. (Docket Nos. 26, 27).[8] During the hearing, he also indicated that despite the Government's production of same to him a month earlier, he was not able to listen to the involved radio transmissions while in the Butler County Jail. (Docket No. 26). Accordingly, Assistant United States Attorney Ross Lenhardt took Waller and his stand-by counsel to listen to the radio transmissions in the U.S. Attorney's office after the hearing so that Waller was able to properly prepare for the May 30, 2014 hearing. *Id.*

At the May 30, 2014 hearing, the Government and Defendant presented evidence, including testimony, and argument. (Docket No. 32). The parties timely filed proposed findings of fact and conclusions of law. (Docket Nos. 44, 52). As the matter has been fully heard, briefed, and argued, it is now ripe for disposition.

III.  ARGUMENTS PRESENTED

In his motion, Waller moves to suppress "all evidence arising out of the stop of the vehicle." (Docket No. 18, at 5). More specifically, Waller asserts that the firearm recovered from his person was obtained without a warrant in violation of the Fourth Amendment, and is the fruit of an illegal search. *Id.* at 7; (Docket No. 25 at 2). In response, the Government asserts that the officers possessed a reasonable suspicion that the red Malibu, in which Waller was a passenger,

---
[8] This Court went through a colloquy with Defendant prior to granting his request to proceed *pro se*. (Docket No. 27).

was involved in the shooting as well as reasonable suspicion to pat Waller down for weapons.[9] (Docket No. 20 at 12-13).

IV. DISCUSSION

It is well-settled that, at a hearing on a motion to suppress, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. Richardson*, 501 F.Supp.2d 724, 734 (W.D. Pa. 2007) (citations omitted).

A. Standing

At the outset, the Court notes that the Government initially challenged Waller's standing to bring his suppression motion. (Docket No. 18 at 5). However, at the May 30, 2014 hearing, the Government agreed that the issue of standing had been resolved as a result of Waller's testimony that he had permission to be in the vehicle. (Tr. at 21:16-22:3, 24:21-25:8) (Waller testifying). Given the Government's concession, the Court need not separately analyze whether Waller has met his burden to establish that he had a reasonable expectation of privacy in the vehicle which belonged to Tyrone Benjamin's sister, Gretchen,[10] to challenge the stop of the vehicle and subsequent seizure of Defendant. The Court now addresses Waller's challenge that his Fourth Amendment rights were violated by the seizure and *Terry* stop. *Terry v. Ohio*, 392 U.S. 1 (1968).

B. Seizure

Before analyzing the stop of the vehicle under *Terry*, the Court first must determine when the officers seized Waller, thereby triggering the protections of the Fourth Amendment,

---

[9] Defendant does not challenge the pat-down of his person.
[10] Gretchen's last name is unknown. (Tr. at 22:8-9).

because the same is not implicated until a seizure occurs. *See County of Sacramento v. Lewis*, 523 U.S. 833, 845 n.7 (1998) ("Attempted seizures of a person are beyond the scope of the Fourth Amendment."). While the Government asserts that Waller was not seized until after the firearm fell from his body, (Docket No. 20 at 11-12), Waller avers that the actual stop of the vehicle was an illegal seizure. (Docket No. 18 at 3). He claims that the evidence must be suppressed for lack of reasonable suspicion to justify the stop. *Id.* at 5. He reiterates this and expands upon same in his Reply:

> The dispositive legal issue is the casual (sic) relationship between the traffic stop and the discovery of the evidence, whether the evidence found in the vehicle was the fruit of the illegal stop
>
> [. . .]
>
> The violation of my Fourth Amendment right was the traffic stop itself, and it is settled law that a traffic stop is a seizure of everyone in the stopped vehicle. *See United States v. Mosley* 454 F.3d 249, 253 (3d Cir. 2006).[11]

(Docket No. 25 at 2). Also in his Reply, Waller avers that he seeks to suppress the evidentiary fruits of that illegal seizure under the fruit of the poisonous tree doctrine. *Id.*

As the Third Circuit guides in *United States v. Brown*, there are three broad categories of police encounters with citizens, and each encompasses varying degrees of constitutional scrutiny (1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests. — F.3d —, 2014 WL 4211171 at *5 (3d Cir.

---

[11] The Court notes that Defendant's reliance on *Mosley*, upon which he wishes to suppress the fruit of an illegal seizure, *i.e.* the gun, is unpersuasive. *Mosley* dealt with the question of whether an *individual* was illegally seized. *Mosley*, 454 F.3d at 253 (emphasis added). The Third Circuit explained: "Passengers in cars, unlike owners or licensees, have no reasonable expectation of privacy in the interior of the vehicle in which they are riding." *Id.* at 252–53. Here, because Defendant cannot establish that the seizure of the car was unconstitutional under the Fourth Amendment, he cannot argue that the evidence found as a result of his seizure was "fruit" of an unconstitutional seizure. *See United States v. Shabazz*, 2012 WL 482033 at *5 (M.D. Pa. Feb. 14, 2012) *aff'd*, 533 F. App'x 158 (3d Cir. 2013) *cert. denied*, — U.S. —, 134 S. Ct. 832 (2013).

Aug. 27, 2014) (citing *United States v. Perez*, 443 F.3d 772, 777 (11th Cir. 2006)). The first category of encounter does not implicate the Fourth Amendment. *Id.* (citing *United States v. Williams*, 413 F.3d 347, 352 (3d Cir. 2005) (stating that officers do not violate the Fourth Amendment "merely by approaching individuals on the street or in other public places"); *see also Florida v. Bostick*, 501 U.S. 429, 434 (1991)). The second category, *i.e.* brief seizures or *Terry* stops, requires a showing that the officer acted with reasonable suspicion. *Id.* (citing *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (stating that an officer may "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot") *Terry*, 392 U.S. at 30). The third category, *i.e.*, full-scale arrests, is proper only when an officer has probable cause. *Id.* (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964) ("Whether [an] arrest was constitutionally valid depends . . . upon whether, at the moment the arrest was made, the officers had probable cause to make it.")).

"The initial step in our suppression analysis is to determine whether a seizure has taken place and, if so, when the seizure occurred." *Id.* (citing *United States v. Torres*, 534 F.3d 207, 210 (3d Cir. 2008); *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003) (stating that in conducting a suppression analysis, the court "must first determine at what moment [the defendant] was seized"). A Fourth Amendment seizure "does not occur simply because a police officer approaches an individual and asks a few questions." *Bostick*, 501 U.S. at 434. Rather, "[a] seizure occurs only 'when [a police officer], by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" *United States v. Crandell*, 554 F.3d 79, 84 (3d Cir. 2009) (quoting *Terry*, 392 U.S. at 19–20 n.16).

"We apply an objective test when evaluating whether an officer's 'show of authority' would have led a reasonable person to believe they were not free to leave." *Brown*, 2014 WL

4211171 at *5 (citing *Crandell*, 554 F.3d at 84) (stating that the test is whether a reasonable person in light of all the circumstances would have perceived the officer's actions as restrictive). The Supreme Court has articulated several factors that are to be considered during a court's objective inquiry, including, *inter alia*, "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554–55 (1980); *see also United States v. Drayton*, 536 U.S. 194, 204 (2002). Additionally, the Court has indicated that a seizure occurs when a police officer uses physical force to restrain a suspect or when a suspect submits to an assertion of authority. *California v. Hodari D.*, 499 U.S. 621, 626 (1991); *accord United States v. Valentine*, 232 F.3d 350, 358 (3d Cir. 2000) ("for there to be a seizure, the police must apply physical force to the person being seized, or where force is absent, have the person seized submit to a show of police authority"). Such a submission to authority occurs when the suspect "manifests compliance with police orders." *United States v. Waterman*, 569 F.3d 144, 146 n. 3 (3d Cir. 2009) (citing *Couden v. Duffy*, 446 F.3d 483 (3d Cir. 2006)).

Furthermore, a defendant's momentary compliance with police directions does not rise to the level of a Fourth Amendment seizure if he "did not submit in any realistic sense to the officers' show of authority." *Valentine*, 232 F.3d at 359; *see also United States v. Grant*, 459 F. App'x 154, 156 (3d Cir. 2012) (unpublished) (defendant who momentarily raised his hands when police ordered him to "show your hands" for no more than a few seconds before fleeing was not seized); *United States v. Samuels*, 131 F. App'x 859, 862 (3d Cir. 2005) (unpublished) (defendant who raised one hand in response to officers' request to raise both his hands did not submit to police authority because he continued to make hand movements toward his waist). In

10

explaining this caveat, the Third Circuit in *Valentine* cited with approval the United States Court of Appeals for the District of Columbia case, *United States v. Washington*, in which the court found that the defendant had not yet been seized when he temporarily stopped his car at the curb in response to police commands but sped away when the officer approached on foot. 12 F.3d 1128, 1132 (D.C. Cir. 1994).

Here, Waller did not submit to the authority of the officers until after the officers tasered him and, therefore, finally were able to physically seize him to place him under arrest. At the outset of the encounter with the officers, by his own admission, Waller refused to comply with them. (Docket No. 18) ("I was non-compliant."). His demand to speak with a supervisor further exemplifies his refusal to submit to the authority of Office Craig and his partner. (Tr. at 91:17-22) (Officer Craig Testifying). In addition to being non-compliant and refusing to submit, the Defendant was also evasive, as he provided false identification to them. (Tr. at 92:10-18) (Officer Craig Testifying); (Tr. at 30:4) (Waller Testifying) ("Yes I gave a fake name").

Moreover, Waller obeyed neither their commands to keep his hands on the dashboard while he was in the vehicle nor their commands to keep his hand on the car after he was pulled from the vehicle. (Tr. at 9:1-9) (Officer Craig Testifying). He did not cooperate with their attempt to restrain him as he was pulled from the vehicle, and after he was removed from the vehicle, a struggle ensued. (Tr. at 94:6-13) (Officer Craig Testifying). Throughout this struggle and in defiance of the officers' orders, Waller continuously held his hand on his left side, where the gun was concealed before it eventually fell to the ground. (Tr. at 94:6-13) (Officer Craig Testifying). Due to his evasive and noncompliant conduct, the officers were not able to arrest Waller until after the gun fell to the ground, and after they maced and tasered him. (Tr. at 95:4-5) (Officer Craig Testifying). *See Hodari D.*, 499 U.S. at 629 (providing that "since [defendant] did

11

not comply with that [show of authority] he was not seized until he was tackled"); *See also Brown*, 2014 WL 4211171 at *6 ("[N]o seizure occurred prior to the moment Detective Gault physically grabbed Brown to prevent him from fleeing the scene.").

Considering the facts, the Court finds that the officers did not seize Waller for purposes of its Fourth Amendment analysis until they arrested him after the firearm fell from his person. Accordingly, all conduct prior to said arrest may be included in the reasonable suspicion analysis of the *Terry* stop. *See Valentine*, 232 F.3d at 359 (providing that "what [defendant] did after he failed to comply with a police order and prior to a seizure may be considered in evaluating reasonable suspicion"). Having determined that the police seized Waller at the time they arrested him and after the discovery of the firearm, Defendant's instant Motion to Suppress fails. In any event, the Court now turns to whether that stop and seizure was justified, *i.e.*, within the bounds of *Terry*. 392 U.S. 1 (1968).

C. *Terry* Stop

The crux of Waller's argument that the seizure was illegal is that the witness's tip that a red Malibu was involved in the shooting was insufficient to form the requisite reasonable suspicion. (Docket No. 18 at 2-3) (arguing that officers acted on unsubstantiated radio broadcasts that lacked details such as how old the vehicle was, the vehicle's license plate number, and the description of the suspects). Waller also claims that the anonymous witness lacks any degree of reliability, and did not provide his or her contact information, location, or basis for the knowledge. *Id.* at 4. Further, he submits that the police lacked any information to corroborate the anonymous tip. *Id.* Waller contends that the stop of the vehicle was illegal, because he believes that the stop was made on the basis of Officer Rummel's hunch, and not reasonable suspicion.

*Id.* at 6. Lastly, Waller maintains that the broadcast made over the police radio was not based on specific and articulable facts. *Id.*

The Government asserts that pursuant to *Terry*, the police officers possessed reasonable suspicion to stop the red Malibu and to conduct a pat-down search of Waller for weapons. (Docket No. 20 at 12-13). Further, the Government contends that it is lawful for a police officer to order a driver out of a stopped vehicle with no additional justification or cause.[12] *Id.* at 9. The Government also argues that Waller did not submit to the officers' authority until after the gun was located; hence, he was not seized until after the firearm was recovered. *Id.* at 7.

The Fourth Amendment protects citizens against unreasonable searches and seizures. U.S. CONST. AMEND. IV; *See also United States v. Ubiles*, 224 F.3d 213, 216 (3d Cir. 2000). Warrantless searches are *per se* unreasonable subject only to a few specifically established and well-delineated exceptions. *Horton v. California*, 496 U.S. 128, 133 (1990). Because no warrant authorized the search here, the burden is on the Government to prove by a preponderance of the evidence that the search fell within one of the recognized exceptions to the warrant requirement. *United States v. Herrold*, 962 F.2d 1131, 1137 (3d Cir. 1992). One exception to the warrant requirement is the *Terry* stop and frisk. 392 U.S. at 20-22.

As stated above, under *Terry*, police officers may stop and briefly detain and pat down an individual for investigative purposes if they have reasonable suspicion that criminal activity is afoot. *Terry*, 392 U.S. at 32. The scope of a valid *Terry* stop includes a brief detention of the person and a pat-down search for weapons short of a traditional arrest. *See Terry*, 392 U.S. at 22-24, 27; *United States v. Yamba*, 506 F.3d 251, 256 (3d Cir. 2007). Relative to the level of

---

[12] The Government acknowledges that Waller does not make this allegation in the body of his motion, but rather writes in the factual section, "I was illegally order[ed] out of the vehicle." (Docket No. 18 at 6); (Docket No. 20 at 9).

suspicion required for a *Terry* stop, the Third Circuit has held that it is "somewhat lower" and "can be established with information that is different in quantity or content than that required for probable cause." *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006); *see also Alabama v. White*, 496 U.S. 325, 330 (1990). Applying an objective standard as to whether the reasonable suspicion standard has been met, "the totality of the circumstances—the whole picture—must be taken into account." *United States v. Cortez*, 449 U.S. 411, 417 (1981).

Additionally, the Third Circuit has articulated several factors that courts may consider in determining whether reasonable suspicion exists, including "[a suspect's] location, a history of crime in the area, [a suspect's] nervous behavior and evasiveness, and [the officers'] 'commonsense judgments and inferences about human behavior.'" *Johnson*, 332 F.3d at 206 (quoting *Wardlow*, 528 U.S. at 124-25; *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002) (reiterating that officers must be allowed to "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them")).

Moreover, while not rigidly defined, reasonable suspicion may be the result of the following factors: "specialized knowledge and investigative inferences," "personal observation of suspicious behavior," "information from sources that prove to be reliable, and information from sources that—while unknown to the police—prove by the accuracy and intimacy of the information provided to be reliable at least as to the details contained within that tip." *United States v. Perminter*, 2012 WL 273349 at *9 (W.D. Pa. Jan. 30, 2012) (quoting *United States v. Ritter*, 416 F.3d 256, 272 (3d Cir. 2005); *see also United States v. Johnson*, 592 F.3d 442, 450 (3d Cir. 2010) (citing *White*, 496 U.S. at 329–31) ("The reliability of an informant's tip can be enhanced further by independent police corroboration of the information provided.")).

Depending upon the totality of the circumstances, reasonable suspicion may be the result of one or a combination of the above and other relevant factors. Further, in a recent case the Third Circuit clarified:

> The "reasonable suspicion" standard requires that law enforcement have "at least a minimal level of objective justification for making the stop." *Wardlow*, 528 U.S. at 123. We base our review on the totality of the circumstances. *See Cortez*, 449 U.S. at 417; *United States v. Brown*, 448 F.3d 239, 246–47 (3d Cir. 2006). Non-predictive anonymous tips, taken alone, are generally of insufficient probative value to warrant an investigatory stop. *See Florida v. J.L.*, 529 U.S. 266, 271 (2000); *United States v. Roberson*, 90 F.3d 75, 78–80 (3d Cir. 1996). But where the responding officer corroborates the tip, such as by observing a suspect whose clothing matches the description provided, and thereafter notices "unusual or suspicious conduct on [the suspect's] part[,]" an investigatory stop may be justified. *Roberson*, 90 F.3d at 80; *see also Wardlow*, 528 U.S. at 124 (noting that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion"). We have also recognized the significance of tips concerning ongoing crimes of violence, *see United States v. Nelson*, 284 F.3d 472, 480 (3d Cir. 2002), and the relevance of a suspect's presence in a high-crime area. *See Brown*, 448 F.3d at 251. The possibility that a suspect's actions may be "capable of innocent explanation" does not, in itself, rule out a reasonable suspicion of criminal activity. *Valentine*, 232 F.3d at 356.

*United States v. Robinson*, 562 F. App'x 72, 74-75 (3d Cir. 2014). Additionally, the Third Circuit gives considerable deference to police officers' determinations of reasonable suspicion. *See, e.g.*, *Nelson*, 284 F.3d at 482. Likewise, courts frequently defer to personal observations and conclusions on the theory that experienced officers can infer criminal activity from conduct that may seem innocuous to a lay person. *Arvizu*, 534 U.S. at 273; *see also Wardlow*, 528 U.S. at 124.

Against this context, the Court turns to the instant facts. Relative to the witness R.N., Waller is incorrect in classifying him as "anonymous." During the May 30, 2014 hearing, Officer Obsenica credibly testified that the witness is male and provided his first and last name, address,

date of birth, and telephone number to him. (Tr. at 60:23-61:20). This is not the case where the police receive an anonymous tip via telephone. Here, Officer Obsenica was immediately at the scene of the crime, and spoke to the witness personally in the presence of another officer, Officer Rummel (*Id.* at 62:3-5). Officer Obsenica testified to the following:

> Q: I want to see if we can go through what Mr. RN told you that particular day. Can you just give us a summary first and then we'll see if we need to follow-up at all.
>
> A: He said that he was drinking at the bar with his neighborhood friend, Tamika McAfee, and that approximately 1:50 in the morning they left the bar walking to his vehicle in the parking lot. He stated that he heard about five gunshots and he observed a red Chevy Malibu and a black-colored vehicle parked in front of Dairy's Market, 7302 Hamilton Avenue, and he stated that he observed two black males in that area and that those vehicles fled at a high rate of speed down Hamilton Avenue, one turning left and one turning right, not sure which vehicle turned or what street.

(Tr. at 62:6-19) (Officer Obsenica Testifying). As stated above, the Court finds Officer Obsenica's testimony to be credible, and therefore the witness's specific, reliable tip is considered in the Court's reasonable suspicion analysis.

The Court also takes into consideration the time and place of the officers' encounter with Waller, which was in high crime area at approximately 2:00 a.m. (*See* Tr. at 54:9-11, 54:19-21) (Officer Obsenica Testifying) (describing Zone 5 as one of the higher crime rate zones within the city of Pittsburgh and the area where the shooting occurred to be one of the higher crime rate areas within Zone 5) (Officer Obsenica Testifying) While "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime," *Wardlow*, 528 U.S. at 124 (citing *Brown v. Texas*, 443 U.S. 47 (1979)), the law does not require officers "to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious

16

to warrant further investigation." *Id.* Therefore, it is permissible for a court to consider "the fact that the stop occurred in a 'high crime area' among the relevant contextual considerations in a *Terry* analysis." *Id.* (citing *Adams v. Williams*, 407 U.S. 143, 144, 147-148 (1972)); *see also U.S. ex rel. Richardson v. Rundle*, 461 F.2d 860, 864 (3d Cir. 1978) (finding reasonable suspicion where police on patrol observe youths running from a store in a high crime neighborhood).

Here, the Court finds it reasonable that the officers would have believed that Waller may have been armed and dangerous and posed a threat to them or others based on the totality of the circumstances faced by the officers, particularly: (1) the vehicle that they pulled over matched the description of one of the two vehicles that R.N., a witness at the scene of the shooting, saw fleeing from the parking lot outside of Phase Bar; (2) the report from R.N. indicated that two black males were near the two vehicles in the area from which the shots originated, and there were two black males in the vehicle; (3) the vehicles fled at a high rate of speed; (4) Waller engaged in suspicious behavior, including his repeated touching of his left side and defiance of the officers' commands to keep his hands on the dashboard and the vehicle; (5) Waller refused to provide accurate identification information to the police; (6) the traffic stop took place in close vicinity to the bar (four to give blocks away) and in close proximity to the events at the bar (approximately twelve minutes after Officer Obsenica's response to the initial report of criminal conduct); (7) the stop occurred at approximately 2:09 a.m.; and (8) the area is known to be a high-crime area.

In reaching this decision, the Court expressly rejects Waller's assertions that the Government's evidentiary support for the *Terry* stop was not supported by the record. Rather, the Court is instructed to determine the reasonableness of the *Terry* stop after considering the

17

totality of the circumstances involved. *See Cortez*, 449 U.S. at 417 ("the totality of the circumstances—the whole picture—must be taken into account."). Applying that standard to the credible evidence presented by the Government in this case leads the Court to conclude that the Government met its burden to prove by a preponderance of the evidence that stop of the vehicle was objectively reasonable and within the confines of *Terry*. *Id*. The officers had reasonable suspicion to stop the vehicle and investigate.

V. CONCLUSION

Based on the foregoing, Waller's Motion to Suppress [18] is DENIED. An appropriate order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date: August 29, 2014

cc/ecf: All counsel of record.
       Michael Tyrone Waller (USM # 30240-068)
       Butler County Prison
       202 S. Washington Street
       Butler, PA 16001